IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
             )    No. 3:20-cv-00381
        Plaintiff )
             )    District Judge Thomas M. Rose
v.            )    Magistrate Judge Caroline H. Gentry
             )
RED ROOF INNS, INC., )
             )
        Defendant. )
_____)

## <u>PLAINTIFF EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff, the Equal Employment Opportunity Commission, hereby moves this court to enter summary judgment in its favor and against Defendant Red Roof Inns on Defendant's "undue hardship" affirmative defense. Plaintiff is entitled to judgment because Defendant lacks evidence that to accommodate Wesley Derby in the Property Connectivity Coordinator position would create a significant difficulty or expense when considering the factors set forth in 42 U.S.C. § 12111(10)(B). Because Defendant cannot meet its burden of proof on this affirmative defense, Plaintiff is entitled to judgment as a matter of law. In further support hereof, Plaintiff submits the attached memorandum, exhibits, and depositions.

Respectfully submitted,

s/ Alysia Robben
Alysia Robben, Trial Attorney
Aimee McFerren, Senior Trial Attorney
U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Louisville Area Office
600 Dr. Martin Luther King Jr. Place
Suite 268
Louisville, Kentucky 40202

(502) 694-3976 (direct)
 (502) 582-5435 (fax)
alysia.robben@eeoc.gov
aimee.mcferren@eeoc.gov

Sarah Doty, Trial Attorney
U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
101 West Ohio Street
Suite 1900
Indianapolis, Indiana 46204
(463) 999-1189 (direct)
(317) 226-5571 (fax)
sarah.doty@eeoc.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2022, I electronically filed the foregoing and

the attached memorandum and exhibits with the Clerk of the Court using the CM/ECF

system. Notice of filing will be performed by the Court's electronic filing system, and

parties may access the document through the electronic filing system.

s/ Alysia Robben
Alysia Robben, Counsel for Plaintiff

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

EQUAL EMPLOYMENT )
OPPORTUNITY COMMISSION, )
                                  )    No. 3:20-cv-00381
              Plaintiff           )
                                  )    District Judge Thomas M. Rose
v.                                )    Magistrate Judge Caroline H. Gentry
                                  )
RED ROOF INNS, INC.,              )
                                  )
              Defendant.          )
_____)

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.    **INTRODUCTION**

This case is about the denial of a Red Roof Inns, Inc. ("Red Roof") promotional

opportunity to a blind employee, Wesley Derby, due to Red Roof's alleged inability to

accommodate him in the position with adaptive technology, the screen reader Job Access With

Speech ("JAWS"). (Complaint, Doc. No. 1 at PageID 1, 4-6.)

Red Roof asserts as an affirmative defense to the EEOC's claims that to accommodate

Derby in the Property Connectivity Coordinator ("PCC") position would have constituted an

"undue burden." (Amended Answer at 6, 9, Doc. No. 8 at PageID 36, 39.) It is assumed that Red

Roof intended to raise a defense of "undue hardship" pursuant to the Americans with Disabilities

Act ("ADA"), *see* 42 U.S.C. § 12112(b)(5)(A), and this motion will hereinafter use the term

"undue hardship" in reference to Red Roof's affirmative defense.

The EEOC asks this court to rule that, as a matter of law, Red Roof's affirmative defense

fails. Red Roof has the burden to show that the proposed reasonable accommodation—in this

case, JAWS software and associated services and modifications—imposes a hardship that is

undue in light of the overall financial resources of the company and the company's operations. *See* 42 U.S.C § 12111 (10). Red Roof has failed to quantify the alleged hardship in any meaningful way, offering only speculation about future problems with JAWS accessibility.

If this issue proceeds to trial, the EEOC will offer evidence to rebut Red Roof's undue hardship defense, and in that sense, there may be "facts in dispute." However, at the summary judgment stage, even viewing Red Roof's evidence in the light most favorable to it as the non-moving party, Red Roof cannot meet its burden. Because Red Roof fails to offer specific facts that a genuine issue exists requiring trial on the defense of undue hardship, summary judgment is appropriate.

## II.     FACTUAL BACKGROUND

### A. Wesley Derby's employment with Red Roof Inns.

Wesley Derby, who is blind, was hired in February 2016 to work in Red Roof Inns' call center, known as the Contact Center, located in Springfield, Ohio. (*See* deposition of Wesley Derby (Derby Dep.), attached as Exh. 1, at 64:19-23, 67:23-25; *see* deposition of Shanna Wright (Wright Dep.), attached as Exh. 2, at 28:6-9, 86:10-14.)

He initially worked in the General Reservations department, taking calls from guests, researching hotel rates and locations, assisting with making reservations, and signing guests up for Red Roof's award program, RediCard. (Derby Dep. at 68:6-25.) He subsequently advanced to the position of RediCard Agent and then Guest Relations Specialist, where he handled complaints from guests. (*Id*. at 77:13-16, 83:11-15, 85:10-86:8.)

Being blind, Derby relied on the computer program JAWS, to perform his duties. (*Id*. at 67:23-68:5, 69:7-13.) JAWS is a screen reader program for Microsoft Windows that allows blind and visually impaired users to read the screen either with a text-to-speech output or by a

2

refreshable Braille display. (Expert report of Mark Tudela, ⁋ 2, attached as Exh. 3.) JAWS reads aloud the text and content of the screen, which allows a blind or visually impaired individual to utilize computer-based applications, software, and websites in the same manner as a sighted counterpart. (Derby Dep. at 43:9-22; Deposition of Daniel Buchness (Buchness Dep.), attached as Exh. 4, at 24:22-25:3.)

In his various roles at Red Roof, Derby used software programs such as RediStay and Scorpion, as well as Microsoft products like Outlook, Word, and Skype. (Derby Dep. at 119:6-16, 146:19-23.) Rood Roof scripted RediStay and Scorpion to make them compatible with JAWS. (*Id*. at 120:4-19.) When he was promoted to Guest Relations in October 2016, Derby was the first blind Red Roof employee to work in the department, requiring Red Roof to create a script for Clarabridge, the software program used to perform the job. (*Id*. at 83:2-3, 97:15-98:16.) "Scripting" is the term used to describe the process of "using computer language and functions to bridge two different programs together." (*See* deposition of Mark Tudela (Tudela Dep.), attached as Exh. 5, at 27:22-24.) When needed, a scripter can create a code using JAWS and other tools that ensure JAWS works effectively. (*Id*. at 29:18-25; 30:1-15; Buchness Dep. at 25:9-17.)

Other programs used by Derby in his jobs, such as Microsoft Word, Microsoft Outlook, and Skype, did not require scripting for use with JAWS. Instead, these programs worked with JAWS "out of the box." (Derby Dep. at 59:23-60:24.) "Out of the box" refers to the ability of JAWS, as originally programmed and without additional scripting, to work well with the computer application. (Buchness Dep. at 25:10-18; 77:10-19.) JAWS, as originally programmed, is powerful and has built-in functions and keystrokes that "do a pretty good job" of providing access without additional scripting. (Tudela Dep. at 31:25-32:2; 117:21-23; 135:10-17.) For all

of its scripting work, Red Roof has utilized the services of Mark Tudela, Ph.D., Defendant's expert in this matter. (Wright Dep. at 94: 23-25.)

Derby is a sophisticated JAWS user. Tudela called Derby a "rock star" and considered him to be in the "95th percentile" of JAWS users that he has worked with. (Tudela Dep. at 85:9-86:4, 87:14-88:5.) Derby has used JAWS extensively, both personally and professionally, since approximately 1993. (Derby Dep. at 41:10-42:20.)

**B.  Red Roof Inns' employment of visually impaired employees.**

Red Roof Inns, Inc. is an international hotel chain with more than 650 properties in the U.S., Brazil and Japan. *See* Red Rood company information page, https://www.redroof.com/why-red-roof/index (last visited March 28, 2022). Its revenue reached $657 million in the first nine months of 2021. *See* Christine Killion, Resilience and Recovery: Hundreds Gather for Red Roof Regional Meeting in Dallas, Red Roof media page, November 17, 2021, https://www.redroof.com/media/index.

In 2012, Red Roof began working with the non-profit organization Goodwill Easter Seals to hire employees with disabilities at the Contact Center, particularly the blind or visually impaired. (*See* deposition of Linda Gillis (Gillis Dep.), attached as Exh. 6, at 50:2-21.) Goodwill Easter Seals provided training and job coaches to assist the blind or visually impaired employees. (*Id*.; Tudela Dep. at 35:13-25.) Red Roof has employed dozens of visually impaired employees in its Contact Center. (Gillis Dep. at 61:8-13.) Like Derby, the other visually impaired employees worked as Reservation Agents, RediCard Agents, and Guest Relations Specialists and performed their job duties using JAWS. (Wright Dep. at 87:5-88:9.)

Goodwill Easter Seals introduced Tudela to Red Roof. (Gillis Dep. at 57:22-23.) The State of Ohio paid Tudela for the initial scripting he performed on Red Roof's programs. (*Id*. at

4

56:13-22, 57:24-58:13.) Tudela continued his relationship with Red Roof after this initial project, providing support to new hires and updates to JAWS scripting, as necessary. (Tudela Dep. at 41:17-42:2, 71:8-75:1; Gillis Dep. at 62:23-63:8.) Tudela's fees for setting up stations for new hires – and on at least one occasion when a blind employee was promoted – were covered by the state. (Tudela Dep. at 40:14-17; 62:21-63:14; 71:8-74:24; Exh. 7.) Red Roof has paid Tudela for his work when his fees were not covered by the State. (Tudela Dep. at 75:2-6; Gillis Dep. at 65:21-66:2.) The Contact Center director was given no cap on the fees she could pay to Tudela for his work. (Gillis Dep. at 82:17-23.)

### C.  The Property Connectivity Coordinator job.

The Contact Center houses the Online Connectivity Team, although the team is a corporate department managed separately from the Contact Center. (Gillis Dep. 26:1-10.) The Property Connectivity Coordinator ("PCC") position is part of the Online Connectivity Team. (*See* deposition of Cheryl Eichelberger (Eichelberger Dep.), attached as Exhibit 8, at 54:21-23.) In 2018, there were approximately ten PCCs at the Contact Center, and they were primarily responsible for uploading room rates and promotional rates to the websites for Online Travel Agencies ("OTAs") that partner with Red Roof. (*Id*. at 42:24-43:5, 54:2-8; 54:24-55:2; 58:23-59:15.; s*ee* PCC job description, attached as Exh. 9.)

In order to upload promotional rates for the partner OTAs, PCCs must access four "extranet" websites, which are distinguishable from websites accessible by the general public.[1]

---

[1] An extranet is a private network exposed only to select partners, clients, or groups of customers. It is a "back-end" system that is accessible only to individuals who are provided credentials and permissions to access the network. (Expert report of Daniel Buchness, attached as Exh. 10, at 18; Wright Dep. 66:4-16; Eichelberger Dep. 56:6-9.) "Extranet website" refers to a website only accessible to select partners through an extranet network. (Buchness Report, Exh. 10 at 18.)

5

(Wright Dep. at 65:18-66:7; Eichelberger at Dep. 56:6-9.) The extranet websites utilized by the PCCs were Expedia Partner Central, Booking.Com Extranet, Agoda YCS, and Hotel Tonight Extranet. (Wright Dep. at 65:18-66:7.) PCCs access the extranet websites using unique credentials supplied to Red Roof by the OTAs. (Eichelberger Dep. at 55:19-56:15.) Once logged into an extranet website, a PCC can upload rate information, then confirm on the public facing version of the extranet website that the new rate information is being properly shown. (*Id*. at 58:25-59:15.)

### D. Derby inquired about the PCC job and was told the job was inaccessible to JAWS users.

On April 23, 2018, Online Connectivity Team supervisor Cheryl Eichelberger sent an email to all Red Roof employees of the Contact Center, notifying them of an open Property Connectivity Coordinator position. (*Id*. at 77:1-4; *see* Exh. 11.) On May 2, 2018, Eichelberger sent another email, notifying the employees of the Contact Center that the Online Connectivity Team was going to host an information seminar. (*See* Exh. 12.)

Derby replied to Eichelberger's May 2, 2018, email and expressed interest in the informational seminar and possibly applying for the position. (*Id.*) However, in response to his interest, Eichelberger told Derby, "Unfortunately, the systems that we work with do not integrate with the JAWS system, so we are not able to accommodate as far as hiring." (*Id.*) She further encouraged him not to "waste [his] time" attending an informational seminar, since he could not be accommodated in the position. (*Id.)*

### E. Red Roof has not assessed the accessibility of the PCC position or the cost to make it accessible.

At the time of her email to Derby, Eichelberger did not know "anything" about JAWS and its capabilities and limitations and had never supervised a visually impaired employee.

(Eichelberger Dep. 51:10-52:5; 108:22-24.) Eichelberger believes she learned that the JAWS system "didn't work with the extranets that [PCCs] had to deal with every day" from Shanna Wright, a former director of the Online Connectivity Team's department and current vice president of distribution services. (*Id*. at 41:25-42:19, 90:1-7; Wright Dep. 25:15-16, 35:3-5, 38:5-12.) Eichelberger and Wright disagree about whether their conversation on this occurred on the day of Eichelberger's email to Derby, or four years before. (Eichelberger Dep. 90:22-91:3; Wright Dep. pp. 114:9-115:20.) In any event, Wright acknowledges, the information she shared with Eichelberger was based on her own assumptions about whether JAWS could be successfully used in the position. (*Id*. at 114:17-23.) Before that conversation, she spoke to no one else about whether a JAWS user could hold the PCC position or whether JAWS could be used with the extranet websites. (*Id*. at 114:9-16.) Wright has never asked Tudela, Red Roof's only scripter, whether JAWS could be used to perform the PCC job—either before her conversation with Eichelberger or since then. (*Id*. at 112:6-12.)

In fact, no one with Red Roof has taken any steps to confirm that the PCC job cannot be done by a JAWS user. No one with Red Roof has asked Tudela whether he believes JAWS can be used with the PCC's computer applications. (Tudela Dep. 90:12-21.) Further, Tudela has never assessed the computer systems, including the OTA extranet websites, used by the position to determine if they are JAWS-accessible as-is or whether scripting can be used to make the systems JAWS compatible. (*Id.* at 90:1-91:11.) Although Tudela has "poke[d] around" with JAWS on websites used by the PCC position, he does not consider what he did an "assessment," and he still has no opinion on whether the PCC position can be made accessible to a JAWS user. (*Id.* at 102:18-20; 104:22-105:6; 109:19-110:4; 111:19-24.)

Wright also testified that she does not know how much it would cost Red Roof to make the PCC position accessible for JAWS users or to maintain JAWS scripting for the websites used by the PCC position. (Wright Dep. 127:22-128:6.) Although she believes the number would be "quite high," she does not know what the cost would be and has taken no steps to find out. (*Id*. 128:2-15.)

### F. Tudela's expert opinion is limited to speculation about third-party websites in general.

In support of their allegation that the PCC position could not be made accessible to a JAWS user without undue hardship, Red Roof retained their scripter, Mark Tudela, as an expert witness. On January 13, 2022, Tudela issued an expert report. (Exh. 3.) Prior to issuing his report, he had never performed any sort of assessment of the web applications used in the PCC position. (Tudela Dep. at 104:19-21; 113:16-25.) Instead, his report was "general in nature" and "not related to those specific websites" used in the PCC position. (*Id*. at 105:18-21.) His report was referring to third-party websites, generally, under which umbrella the PCC web applications "and many others" would fall. (*Id*. at 113:16-21.)

As stated above, Tudela does not have an opinion on whether the PCC position can be made accessible to a JAWS user. (*Id*. at 109:19-110:4; 111:19-24.) As a result, Tudela also has no estimate of the cost to make the PCC position accessible. (*Id.* at 90:22-91:11.) Instead, he states the PCC position requires the use of many third-party websites; when a third-party website updates its software, previously installed JAWS scripting may no longer be compatible with the website; the JAWS software may need to be re-scripted; and "it is impossible to predict how much time would be required to rescript updates to any third-party websites because each update is unique and varies in terms of complexity." (Exh. 3, Tudela Report, at ₱ 6, 7, 9, 12.) Regarding the impact of website updates on JAWS compatibility, Tudela testified in his deposition that, in a

worst-case scenario, a website could "totally change the look" of the website and "where things are located," such that scripting no longer works. (Tudela Dep. at 126:8-11.) However, an update to a website could be innocuous, or the previously performed scripting could survive the change, if the scripting were made sufficiently "durable" by the scripter. (*Id*. at 125:24-126:8.)

Tudela also states in his report that, when a third-party website updates its software, there may be a period of downtime if previous JAWS scripting is no longer compatible with the site, from the time the JAWS user identifies the problem until it can be re-scripted. (Exh. 3, Tudela Report, at ⁋ 7, 10.) However, as stated above, an update to third party website's software may be innocuous or cause no problem with the pre-existing script. (Tudela Dep. at 125:24-126:8.) Even with a problem, a more highly skilled JAWS user could find another way to navigate the site. (*Id*. at 134:24-135:9.) Or, as another option, JAWS may be used "manually" to navigate a site without scripting. (*Id*. at 135:11-22.)

### III.   APPLICABLE LAW

### A.  Summary judgment standard.

A party may seek summary judgment on any defense. Fed. R. Civ. P. 56(a). Indeed, one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Jankowski v. Dean Foods Co.*, 378 F. Supp. 3d 697, 712. (N.D. Ill. 2019), citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the non-moving party lacks evidence to support its case. *Celotex*, 477

U.S 317. The non-moving party must affirmatively demonstrate with "specific facts" that a genuine issue exists that requires trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). The opposing party's evidence must be more than "merely colorable" but must be "significantly probative." *Id.* at 249-50.

> **B. The ADA requirements to engage in the interactive process and provide reasonable accommodations.**

The Americans with Disabilities Act (ADA) requires employers to reasonably accommodate the known disabilities of otherwise qualified employees and applicants, unless an employer can demonstrate the accommodation would pose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A). To that end, the ADA prohibits an employer from denying an employment opportunity to a qualified job applicant or employee because of the need to make reasonable accommodation. 42 U.S.C. § 12112(b)(5)(B).

"Reasonable accommodation" means, among other things, making modifications or adjustments to the manner or circumstances under which the position desired is customarily performed that enable a qualified individual with a disability to perform the essential functions of the job. 29 C.F.R. § 1630.2(o)(1). A reasonable accommodation may include acquisition or modifications of equipment or devices, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(B); 29C.F.R. § 1630.2.

In considering an employee's need for an accommodation, the employer has a duty to engage in an interactive process to identify the precise limitations resulting from the employee's disability and potential reasonable accommodations that would overcome those limitations. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018). Employers must engage in a good faith process and make an individualized inquiry to determine whether a reasonable

accommodation can be made. *Id.* The interactive process should be a bilateral discussion, because "each party holds information the other does not have or cannot easily obtain." *See Taylor v. Phoenixville School Dist.*, 174 F.3d 142 (3rd Cir. 1999) (noting that employers will not always understand what the disabled employee is capable of and the employee will not always understand what accommodations are reasonably available).

To make a prima facie showing on a reasonable accommodation claim, "a plaintiff must merely suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir.1998) (internal quotation omitted). This initial burden "need not be onerous." *Id.* Simply put, the accommodation "must seem reasonable on its face." *Blanchet v. Charter Communs., LLC*, 27 F.4th 1221 (6th Cir. 2022), quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).

Upon a showing of a reasonable accommodation, the defendant bears the burden to show that accommodating the plaintiff would impose an undue hardship on the operation of its business. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Courts have reconciled and kept distinct the "reasonable accommodation" and "undue hardship" requirements by holding that, at the summary judgment stage, the reasonable-accommodation inquiry asks whether an accommodation "is reasonable in the run of cases, whereas the undue hardship inquiry focuses on the hardships imposed by the plaintiff's preferred accommodation in the context of the particular [employer's] operations." *Keith*, 703 F.3d at 927 (internal quotes omitted); *accord US Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002). An employee's burden to show an accommodation is "reasonable" is not the mirror image of the "undue hardship" burden. The distinct requirements, with their different focuses, avoid the need for an employee to prove the *absence* of hardship to the employer, where the employer is in a better

position to prove the presence of business hardship. *See Barnett*, 535 at 400-02 (discussing the different burdens placed on the employee and employer in a reasonable accommodation case).

At trial, the EEOC will show that Red Roof denied Derby the opportunity for promotion to the PCC position because of his need for a reasonable accommodation, the use of JAWS in the position. The EEOC will show that this accommodation was reasonable on its face, as Red Roof had already provided JAWS software and associated services and modifications for dozens of visually impaired employees, including Derby, in various positions in its Contact Center. (Gillis Dep. at 120:4-10; Wright Dep. at 87:5-88:17.) JAWS was already used by Red Roof employees to access a variety of computer programs, including RediStay, a program also used in the PCC job. (Eichelberger Dep. at 55:8-15.) Further, given Red Roof's history of working with Mark Tudela, Goodwill Easter Seals, and the State of Ohio to make Red Roof programs and applications accessible to blind employees, the costs of which were frequently borne by Goodwill and/or the State, from a financial perspective, providing JAWS as an accommodation was facially plausible. (Depositions of Gillis and Tudela, *supra* at 4-5.)

The EEOC will also show that Red Roof failed to make an individualized assessment or engage in the interactive process, as it decided a blind individual could not hold the PCC job without first taking any steps to determine if the position was JAWS-accessible or whether any other accommodations were available to permit Derby to perform the essential functions of the job. The two decision-makers, Eichelberger and Wright, testified they lacked expertise regarding JAWS and its capabilities or limitations, consulted with no one with that knowledge before rejecting Derby, and did not ask Derby or another blind person to try using JAWS with the position's programs. (Eichelberger Dep. at 51:10-13, 52:3-5, 89:15-20; Wright Dep. at 21:12-22:5, 111:15-112:15, 114:9-16, 128:16-129:8.) *See Keith*, 703 F.3d at 924 (rejecting employer's

disqualification of a deaf individual for a job where the decision-maker had no education, training, or experience regarding the ability of deaf individuals to perform the work and where the employer never allowed the applicant to demonstrate his abilities.)

To date, Red Roof has taken no steps to determine whether the PCC position can be made accessible as a promotional opportunity for its blind and visually impaired employees.

## IV. ARGUMENT

### A. Red Roof has the burden of proving that JAWS-accessibility would impose an undue hardship on the operation of its business.

As discussed above, an employer bears the burden of showing that a proposed reasonable accommodation would impose an undue hardship in the particular circumstances of the employer's operations. *See* 42 U.S.C. § 12112(b)(5)(A); *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002); *Keith*, 703 F.3d at 927; *Cehrs*, 155 F.3d at 781 (citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 n. 12 (6th Cir.1996)).

The ADA defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." 42 U.S.C. §12111(10)(A). Subparagraph (B), in turn, provides a list of factors courts should consider in determining whether an accommodation would pose an undue hardship:

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness,

13

administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C § 12111(10)(B). *See Cehrs*, 155 F.3d at 781-82.

As the Second Circuit has articulated, "undue" hardship is a relational term that looks not just to the costs that the employer is asked to assume but also the benefits to others that will result. *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995). The employer thus bears the burden of performing a cost/benefit analysis that is more refined than the analysis a plaintiff must do to meet his burden to show a reasonable accommodation existed. *Id.* The hardship should be analyzed through the lens of the factors listed above, "which include consideration of the industry to which the employer belongs as well as the individual characteristics of the particular…employer." *Id.*

**B. Red Roof cannot meet its burden because it lacks evidence that making the position accessible would cause the company significant difficulty or expense in comparison to its overall resources.**

Even viewing Red Roof's evidence in the light most favorable to it, Red Roof has failed to put forth sufficient evidence of the financial or operational hardship that accommodating Derby would cause, in order to meet its burden of proof under the ADA.

*1. Red Roof has failed to quantify a significant expense required to make the PCC position accessible.*

Red Roof has failed to quantify the financial burden of accommodating Derby in the PCC position in any meaningful way to determine whether the burden creates an undue hardship in light of the company's overall resources.

In *Jankowski v. Dean Foods Co.*, a district court granted an employee's motion for summary judgment on the defendant-employer's undue hardship defense, as the employer failed to set forth specific facts that a genuine issue existed requiring trial on the defense. 378 F. Supp. 3d 697 (N.D. Ill. 2019). There, Dean argued that accommodating the plaintiff's disability would

14

have required other dairy plant operators to perform tasks that plaintiff was restricted from doing, due to a lifting restriction. *Id.* at 712. This, Dean argued, would have slowed down production at the plant and affected the efficiency of operations. *Id.* In reply, the plaintiff argued that the alleged lack of productivity was not quantified in any meaningful way. *Id.* at 712. The district court agreed, stating that Dean failed to identify evidence quantifying the financial burden that would accompany accommodating the plaintiff, which was necessary to evaluate the factors listed in 42 U.S.C. § 12111(10)(B). *Id.* at 713.

Likewise here, Red Roof has not quantified the alleged hardship of accommodating Derby in any meaningful way. Specifically, Red Roof lacks evidence of: (1) a financial hardship expected to result from initially scripting the position's computer applications for JAWS use; (2) a financial hardship expected to result from scripting future updates to computer applications used in the position; (3) a financial hardship expected to result from the speculative downtime caused by future updates; and (4) the burden of these expected costs in comparison to the company's overall financial, technological, and other resources.

Red Roof has already accommodated blind and visually impaired employees without undue hardship. As described in the facts section, above, Red Roof employs a number of blind employees in its Contact Center who require JAWS software and associated scripting services and training. For years, it has contracted with a professional JAWS scripter whose services are often paid for by the State of Ohio. (Gillis Dep. at 56:13-22, 57:24-58:13; Tudela Dep. 40:14-17, 62:21-63:14, 71:8-74:24.) To the extent Red Roof has been required to pay Tudela directly for his services, Red Roof has offered no evidence that this has caused an undue financial hardship to date. For example, the Contact Center Director, Linda Gillis, testified that she was never given a cap on the fees she could pay Tudela for his services. (Gillis Dep. at 82:17-23.) Similarly,

although Derby experienced downtime while scripting services were obtained to ensure JAWS compatibility with a new position's software, there has been no evidence this caused the company an undue financial hardship. (Derby Dep. at 97-98.)

Red Roof has offered insufficient proof that accommodating a blind employee in the PCC position would be significantly different. Red Roof argues that this position is different than the other positions in which visually impaired employees work, in that it utilizes web applications—the four online travel agency extranet websites—that are outside of Red Roof's control. Red Roof further argues that these websites experience frequent updates, which would cause problems with JAWS compatibility, requiring re-scripting for JAWS and creating downtime for the employee. Although the EEOC will dispute each aspect of this claim, even taking them as true, each is speculative, and the resulting alleged hardship has not been quantified. For example, Red Roof's expert and contract scripter has not conducted an assessment of the PCC position's computer applications to determine whether they are currently compatible with JAWS or require scripting. (Tudela Dep. at 90:1-91:11.) He further cannot say how much any required scripting would cost, either initially or in the future, should future software updates require additional scripting services. (*Id.* at 90:22-91:11; Exh. 3, Tudela Report, at P 12.) As discussed in more detail below, there is also insufficient evidence of alleged downtime that Derby would experience in the position or the hardship this would create for the company.

Finally, Red Roof has failed to perform a sufficient cost/benefit analysis that considers not only the cost to Red Roof of making the PCC position accessible to a JAWS user but other statutory factors. *See, e.g., Reyazuddin v. Montgomery Cty.*, 789 F.3d 407 (4th Cir. 2015) (finding that the cost of making a call center job accessible to a blind employee should not be viewed in isolation of other factors). For example, Red Roof's evidence must show that the cost

would still be an undue hardship even considering factors such as the number of visually impaired employees who could benefit from another JAWS-accessible position, the company's pre-existing relationship with a JAWS scripter, resources available from the State of Ohio for promotional hires, and the company's overall financial resources. *See, e.g., id.* at 418.

Put simply, this court should require specific evidence of the cost/benefit analysis required of employers under the ADA and sufficient evidence for a jury to find a hardship that is so significant as to obviate its obligations under the ADA. In the absence of such, like the court in *Dean*, this court should find no triable issue of fact and enter judgment against Red Roof on this defense.

2. *Red Roof lacks evidence of a significant difficulty to make the PCC position accessible.*

To the extent that Red Roof argues that accommodating a blind employee in the PCC position would impose an operational hardship distinct from a financial hardship, Red Roof's evidence is so speculative that it cannot meet its burden of proof under the ADA.

First, Red Roof can only speculate that future updates to OTA extranet websites will cause problems for JAWS compatibility. Red Roof alleges the extranet websites update their software frequently. (Wright Dep. at 113:4-7.) Although the EEOC will dispute evidence of this if presented at trial, even assuming the accuracy of the evidence, Red Roof cannot establish the frequency with which these updates will result in problems with JAWS compatibility. For example, Red Roof has no evidence that any previous updates ever affected JAWS. (*See, e.g.*, Wright Dep. at 129:1-4.) Shanna Wright, who testified to weekly updates on the websites, cannot say the updates ever had, or will in the future, cause compatibility problems with the JAWS screen reader, as she has no personal experience using JAWS, being trained on JAWS, or supervising a visually impaired employee. (Wright Dep. at 87:15-18, 95:11-12, 96:6-7.) As for

Red Roof's expert, he can only say that a future update to a third-party website "may" cause a problem with JAWS. (Exh. 3, Tudela Report, ¶ 7.) On the other hand, he says, it may not. For example, the update could be "innocuous," or the previous scripting could be "durable" enough to withstand the change. (Tudela Dep. 125:24-126:8.) As such, the frequency with which previous JAWS scripting would be incompatible with future extranet website updates is totally speculative.

Second, even if a given update did affect previous scripting, Red Roof has not offered sufficient proof that, in that circumstance, we can expect Derby would be unable to perform the essential functions of his job. As Tudela acknowledged, JAWS may be able to be used manually—that is, without scripting—to access a website. (Tudela Dep. at 135:11-22.) A JAWS user, particularly a sophisticated one like Derby, may even be able to find other work-arounds to access the site. (Tudela Dep. 134:24-135:9; Exh. 10, Buchness Report, at 13-14.) As such, how a future update will affect a JAWS user's ability to read and navigate the website is purely speculative.

Third, even assuming a future update affected Derby's ability to use JAWS to read or navigate a particular website page, Red Roof has offered insufficient proof of the length of "downtime" that can be expected. Red Roof can only say that it is possible a scripter will be unavailable at the time, leading to a delay in providing scripting services. (*See, e.g.*, Exh. 3, Tudela Report, ¶11, stating "the amount of time to rescript a third party (sic) website ….is contingent upon…the availability of a specialized JAWS scripter.") On the other hand, one could imagine, it is just as possible that a scripter is available to address a problem with JAWS scripting in a reasonably timely manner. Additionally, Red Roof admits, the length of time the scripter would require to create or fix a script is also speculative. (Exh. 3, Tudela Report, ¶ 12.)

18

In short, Red Roof offers no specific evidence of the amount of downtime Derby would experience in the PCC role in any given month or year. As such, the length of any downtime is entirely speculative.

Finally, assuming that Derby would experience downtime at some point while performing the PCC job, Red Roof cannot meet its burden to show that any such downtime would cause an *undue* hardship. It offers no specific evidence for the way this downtime can be expected to impact the performance of Derby's job, the job of other PCCs in the department, the work of the department overall, or Red Roof's overall operations. Moreover, it offers no quantification of the financial hardship it expects to experience as a result of the alleged downtime.

As the court did in *Jankowski v. Dean Foods Co.*, this Court should find Red Roof has failed to quantify the undue hardship it would experience by accommodating Derby, and its defense fails.

## V.    CONCLUSION

Because Red Roof cannot meet its burden to demonstrate undue hardship considering the factors in 42 U.S.C. § 12111(10)(B), this Court should enter summary judgment in favor of the plaintiff on this affirmative defense.

Respectfully submitted,

s/ Alysia Robben
Alysia Robben, Trial Attorney
Aimee McFerren, Senior Trial Attorney
U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Louisville Area Office
600 Dr. Martin Luther King Jr. Place
Suite 268

19

Louisville, Kentucky 40202
(502) 694-3976 (direct)
(502) 582-5435 (fax)
alysia.robben@eeoc.gov
aimee.mcferren@eeoc.gov


Sarah Doty, Trial Attorney
U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
101 West Ohio Street
Suite 1900
Indianapolis, Indiana 46204
(463) 999-1189 (direct)
(317) 226-5571 (fax)
sarah.doty@eeoc.gov