**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | : : | |
| | : | Case No. 3:20-cv-381 |
| Plaintiff, | : | |
| | : | Judge Thomas M. Rose |
| v. | : | |
| | : | |
| RED ROOF INNS, INC., | : | |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER DENYING DEFENDANT RED ROOF INNS, INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT (DOC. NO. 58) AND DENYING PLAINTIFF EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 57)**

---

Plaintiff Equal Employment Opportunity Commission (the "EEOC") alleges that Defendant Red Roof Inns, Inc. ("Red Roof") violated the American with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, as amended (the "ADA"). (Doc. No. 1; Doc. No. 59.) The EEOC claims that Red Roof failed to accommodate Wesley Derby ("Derby"), an individual who is visually impaired, in his attempt to learn more about a promotion, his attempt to compete for that promotion, and the denial of that promotion. (Doc. No. 1 at PageID 1, 4.)

Pending before the Court are two motions: a motion for summary judgment filed by Red Roof (Doc. No. 58) ("Red Roof's MSJ") and a motion for partial summary judgment filed by the EEOC (Doc. No. 57) ("EEOC's MSJ"). As explained below, the Court finds that neither motion should be granted. Therefore, the Court **DENIES** Defendant Red Roof Inns, Inc.'s Amended Motion for Summary Judgment (Doc. No. 58) and **DENIES** Plaintiff EEOC's Motion for Partial Summary Judgment (Doc. No. 57).

1

I.      **BACKGROUND**

A.  **Derby's Disability, Employment with Red Roof, and Use of the JAWS Program**

Derby "is a visually impaired individual who formally worked at [Red Roof's] Contact Center beginning in 2016."  (Doc. No. 58 at PageID 735.)  "Between 2016 and 2018, Mr. Derby was promoted within the company several times."  (*Id.*)  He worked as a Contact Representative, then as a RediCard agent, then as a Guest Relations agent.  (Doc. No. 59-6 (Derby Dep. Excerpts) at PageID 887, 889, 891.)

"Throughout his employment at [Red Roof], Mr. Derby performed his job with the aid of Jobs Access with Speech ('JAWS') software."  (Doc. No. 58 at PageID 735.)  JAWS is a computer screen reading program for Microsoft Windows that allows blind and visually-impaired individuals to read the screen either with a text-to-speech output or a refreshable Braille display. (Doc. No. 58-2 (Tudela Dep. Excerpts) at PageID 770; Doc. No. 59-8 (Buchness Rebuttal Report) at PageID 907.)  For example, Derby uses JAWS to browse the Internet.  (Doc. No. 59-6 at PageID 885.)

A process called "scripting" is sometimes used to "bridge two different [computer] programs together."  (Doc. No. 57-5 (Tudela Dep. Excerpts) at PageID 657.)  Red Roof used Mark Tudela ("Tudela") to script certain computer programs that Derby utilized to perform his jobs with Red Roof so that those programs would be compatible with JAWS.  (Doc. No. 59-6 at PageID 893-94; Doc. No. 59-3 (Wright Dep. Excerpts) at PageID 868.)  RediStay and Scorpion are two examples of such programs, while other programs that Derby used to perform his jobs (such as Microsoft Outlook) did not require scripting for use with JAWS because they worked with JAWS "out of the box."  (Doc. No. 59-6 at PageID 886, 893, 894.)  Derby has been using JAWS for nearly thirty years, both personally and professionally.  (Doc. No. 59-6 at PageID 884-85.)  Tudela considers Derby a "rock star" when it comes to his level of sophistication with JAWS, putting him

in the 95th percentile of JAWS users in terms of his ability to retain information.  (Doc. No. 59-9 (Tudela Dep. Excerpts) at PageID 931.)

**B.  <u>Open Position with Red Roof's Online Connectivity Team</u>**

Cheryl Eichelberger ("Eichelberger") was the Red Roof employee responsible for interviewing and hiring employees for Red Roof's Online Connectivity Team.  (Doc. No. 59-2 (Eichelberger Dep. Excerpts) at PageID 843.)   The Online Connectivity Team consisted of Property Connectivity Coordinators ("PCCs").  On April 23, 2018, while serving as the Online Connectivity Supervisor – Distribution Services, she sent out an email announcing an open PCC position and inviting recipients of the email who were interested to apply.  (Doc. No. 59-1 (Email) at PageID 836.)  Derby does not believe that he responded to that email.  (Doc. No. 58-1 (Derby Dep. Excerpts) at PageID 758.)

To perform their duties, PCCs used Red Roof's RediStay program and "a lot of the online travel agency extranets" for which Red Roof employees "had to have [their] own log-in and passwords."  (Doc. No. 58-4 (Eichelberger Dep. Excerpts) at PageID 784.)  Priceline and Expedia are examples of the online travel agencies whose extranets the PCCs used.  (*Id.* at PageID 784-85.)  Eichelberger, who supervised the PCCs at Red Roof, testified during her deposition about an example of "the meat and potatoes" of what a PCC would do each day:  "[I]f a national sales rep wanted one of their [Red Roof] properties to run a promotion, for instance, 20 percent off a two-night stay for the month of February, we as connectivity coordinators had to load those rates, that percentage off in our system, push it through to the online travel agencies, and make sure that it was done correctly on the online travel agencies to show up on the website when the consumers went out to the different online travel agency sites."  (*Id.* at PageID 785.)

The PCC job description set forth the purpose of the job, its duties and responsibilities, its qualifications, and additional information:

**Job purpose**

The Property Connectivity Coordinator will be trained in all aspects of Online Connectivity and will have continued responsibilities in each area. The responsibilities of the position include: loading and maintaining all promotional rates on the Online Travel Agency (OTA) sites, adding and removing room types or rates on the OTA sites, and coordinating the activation of hotels on these sites. The OTA sites include: Expedia, Booking.com, Priceline, Hotwire, Getaroom, Agoda and GTA (and any other sites which are introduced in the future). This position is also responsible for processing commission inquiries from travel agencies.

**Duties and responsibilities**

- Activate hotels on the OTA sites, including communication with the hotel and our OTA partners, completing required spreadsheets/paperwork and tracking process
- Load promotions received from Revenue Managers in a timely manner; follow-up to ensure proper loading and display
- Update room types and/or rates for hotels on the OTA sites
- Work with OTA partners to investigate and correct any issues related to rates or availability on the OTA sites
- Maintain detailed logs of promotions, activations and all department procedures
- Ensure integrity of all data entered, with close attention to detail
- Support revenue management and operations departments in efforts to maximize bookings across all channels
- Research commission inquiries and respond to travel agencies in a timely manner
- Other duties as assigned

**Qualifications**

- Associates degree or equivalent work experience required
- Basic knowledge of Microsoft Office (Word, Excel), proficient knowledge of Outlook (organizing emails across multiple boxes and archiving) and experience using the Internet to research and collect information required
- Must have acute attention to detail, ability to learn quickly, excellent organization and time-management skills and ability to execute on overlapping multi-step processes
- Must be able to work under pressure, keep current on a multitude of programs/policies and multi-task with the flexibility to switch focuses as necessary to meet urgent deadlines
- Must be self-motivated and able to work independently
- Excellent verbal and written communication skills required
- Experience in hospitality or travel industry preferred

4

**Additional Information**

- Training will occur in the Springfield Contact Center
- Position will become home-based after training is complete; however, monthly, weekly, and/or permanent in-office work may be required based on performance and/or department need
- Position is Monday through Friday, during regular business hours (shift ending no earlier than 5pm)

(Doc. No. 57-9 (emphasis in original).) Derby has an associate's degree, knowledge of Microsoft Office and Outlook, and experience using the Internet to research and collect information. (Doc. No. 59-6 at PageID 881, 897.) Derby also testified that he believes he possesses each of the qualifications listed in the PCC job description, as well as experience in the hospitality or travel industry. (*Id.*) To move from his Guest Relations position to the PCC position would have been a promotion for Derby. (Doc. No. 59-3 at PageID 861.)

### C. **Email Exchange between Eichelberger and Derby**

After posting the position, Eichelberger sent an email regarding the posting and an information seminar. (Doc. No. 58-4 at PageID 795.) The communication between Derby and Eichelberger regarding the position, information seminar, and Derby's interest in the position consists of only four emails. The first is an email sent by Eichelberger (to an unknown number of people) at 1:32 p.m. on May 2, 2018, with the subject line "Online Connectivity Information Seminar":

EXCITING NEWS!!!!

With the recent posting for the open position for the *Online Connectivity Team*, we have decided to hold an **Online Connectivity Information Seminar!**

We have also decided to extend the deadline for you to get your Position Interest Form (attached) and resume to your supervisor to the end-of-day on **Friday May 11th.**

**What:** Online Connectivity Information Seminar

**When:** Tuesday May 8th, 10:00 – 11:00 am

**Where:**  Contact Center – Training Room

**How:**  'Reply all' to this email stating that you would like to attend and staffing will get it added to your schedule.

**Why:**  To help employees interested in joining the Online Connectivity Team get a better understanding of the position.

Please let me know if you have any questions.  I look forward to seeing you there!

Thanks,

Cheryl

(Doc. No. 58-4 at PageID 793-96 (emphasis in original).)  The second email is Derby's response

to Eichelberger at 3:22 p.m. that same day:

Good Afternoon,

I'm interested in attending…However, is there an option to attend via Skype or some other remote option?  Being blind, I don't drive, and the Uber ride from Columbus to Springfield and back would be a couple days' pay.  So, if there's a distance option, I'm interested in checking this out and possibly applying.

Thanks.

(*Id.*)  The third email is Eichelberger's response to Derby the next day (May 3, 2018) at 11:01

a.m.:

Good morning Wesley.

Thanks so much for your interest.  Unfortunately, the systems that we work with do not integrate with the JAWS system, so we are not able to accommodate as far as hiring.  However, if you are looking to advance your knowledge of what happens behind the scenes, we are happy to accommodate.  I just don't want you to waste your time if you were looking to apply.

With this being our first seminar, we would like to get the bugs worked out before we offer it via Skype.  We will be holding more seminars in the near future for informational purposes for other departments, so it may be more beneficial for you to attend one of those when we can Skype you in.  😊

Please let me know if you have any questions.

Thanks,

> Cheryl

(*Id.*)  Finally, the fourth email is Derby's response back to Eichelberger two minutes later (on May

3, 2018 at 11:03 a.m.):

> Hi, Cheryl.
>
> Thanks so much for getting back to me.  I'd definitely be interested in learning more in [the] future.  I'm always looking to diversify my knowledge, and move up as far as I can in the company.
>
> Thanks again.
>
> Wes

(*Id.*)

Prior to this email exchange, Eichelberger had never communicated with Derby.  (Doc.

No. 59-2 at PageID 848.)  She learned that Derby was blind through this exchange, and she had

never supervised a visually-impaired employee.  (*Id.* at PageID 853.)  Eichelberger testified that

she does not recognize this email exchange as a request for an accommodation, although she does

not know why.  (Doc. No. 58-4 at PageID 790.)  She also testified that she thought it was great

that Derby was interested in possibly applying for the PCC position and that she told Derby not to

apply because she "didn't want him to spend his money if [Red Roof] couldn't have him in [her]

department because the systems didn't integrate."  (*Id.*)

Eichelberger admitted that she never spoke to anyone about Derby before she sent her reply

to him.  (Doc. No. 59-2 at PageID 848.)  She testified that she "didn't feel there was a reason to"

speak with anyone before responding.  (*Id.*)  Eichelberger testified that her understanding that the

Online Connectivity Team's system did not integrate with the JAWS system—which she then

relayed to Derby in her email response—came from a prior discussion that she had with Shanna

Wright ("Wright"), a former director of Distribution Services.  (Doc. No. 58-4 at PageID 790.)

Eichelberger testified that she "had been told [by Wright] that the JAWS system didn't work with

the extranets that [they] had to deal with every day, so [she] didn't see a reason to tell anybody anything." (Doc. No. 59-2 at PageID 848-49.) Eichelberger could not recall when she had this alleged discussion with Wright (including whether it occurred in 2018), and Eichelberger did not follow up to see if what she had allegedly been told by Wright still held true. (Doc. No. 58-4; Doc. No. 59-2 at PageID 851.) Eichelberger acknowledged that the alleged conversation could have taken place four years prior to her email to Derby. (Doc. No. 59-2 at PageID 849.)

On the other hand, Wright testified that she believes she did have a conversation with Eichelberger around May 2, 2018 regarding whether someone who is visually-impaired would be able to work in the Online Connectivity Department due to the systems used and JAWS' capabilities. (Doc. No. 59-3 at PageID 869-70.) Wright testified that she believes that the nature of the discussion was whether a blind person could work in the department, and she further testified that they discussed the systems used in the department, the frequency with which those systems changed, "and just generally about how we believed it would be difficult to keep up with all of the scripting changes with all of these systems, and so it likely wouldn't be reasonable for someone who needed the JAWS system to fill this role." (*Id.*) Wright acknowledged that, regardless of when such a conversation took place (assuming that it did), she had not talked to anyone other than Eichelberger about whether JAWS could be used with the extranet sites that the PCCs used, and Wright does not believe that she had ever talked to anyone about whether a JAWS user could hold a PCC position. (*Id.* at PageID 871.) Thus, she did not speak with anyone in Red Roof's human resources department or information technology department.

Additionally, Eichelberger acknowledged that she does not know anything about the JAWS system other than "the visually-impaired use it" and it "helps the visually-impaired see to do [sic] reservations." (Doc. No. 59-2 at PageID 842.) She possesses no knowledge regarding JAWS'

8

capabilities and limitations. (*Id.*) Eichelberger further testified that she never inquired with anyone regarding whether another accommodation other than JAWS was possible; she doesn't know "of anything else other than JAWS that would work for the blind." (*Id.* at PageID 851.) In explaining the statement in her email to Derby that she "just [doesn't] want you to waste your time if you were looking to apply," she testified that meant that, "[i]f he wanted to apply, [she] knew that the JAWS didn't integrate, the JAWS system didn't integrate, so there was no way he was going to be able to get the position, because he wouldn't be able to see it. He wouldn't be able to work the systems." (Doc. No. 59-2 at PageID 851.)

Eichelberger also testified that, at the time she received Derby's email, she did not reach out to IT to see if it was possible to have Derby attend the information seminar by Skype. (Doc. No. 58-4 at PageID 790.) She also did not have any additional informational seminars scheduled, and it turned out that she never scheduled any additional information seminars; she left Red Roof in August of 2018. (Doc. No. 59-2 at PageID 852.)

Red Roof offered company-wide training on topics that included the ADA and reasonable accommodations. (Doc. No. 59-10 (Gillis Dep. Excerpts) at PageID 942.) Supervisors and managers from the Contact Center were required to attend. (*Id.*) Eichelberger was the supervisor of the Online Connectivity Department, and her direct report was in Red Roof's corporate office. (*Id.*) Wright was aware that Red Roof had a "process" related to reasonable accommodations for individuals with disabilities, and her "understanding was that if such a request was made, it needed to be brought to the attention of HR." (Doc. No. 59-3 at PageID 862.) Wright also knew that Red Roof employed visually-impaired individuals who used JAWS. (*Id.* at PageID 867.)

### D. Expert Assessments of JAWS' Use in the PCC position

Each party has designated someone with JAWS adaption and customization experience and knowledge to testify on its behalf: Daniel Buchness ("Buchness") on behalf of the EEOC and

9

Tudela on behalf of Red Roof.  (*See* Doc. No. 58-2 (Tudela report); Doc. No. 59-8 (Buchness rebuttal report).)  Tudela explained that there are three overarching issues with attempting to accommodate a blind individual to perform as a PCC by using JAWS: the online travel agency extranets are outside of Red Roof's control; changes are made to the online travel agency extranets frequently and without notice[1]; and, until such changes can be addressed by a specialized JAWS scripter, such changes may result in a period of downtime during which the blind employee may be unable to perform the functions of a PCC.  (*See* Doc. No. 58-2; Doc. No. 58 at PageID 739-40.)  Tudela also stated that his "hourly rate for contractor scripting with Red Roof Inn is $125 per hour," but, in his opinion, "it is impossible to predict how much time would be required to rescript updates to any third party website because each update is unique and varies in terms of complexity."  (Doc. No. 58-2 at PageID 771.)

In rebuttal, Buchness said that Tudela "did not perform a thorough assessment of the applications before preparing his report to determine whether scripting for these specific applications would be necessary, or to what degree it might be necessary given Mr. Derby's skill level with" access technologies.  (Doc. No. 59-8 at PageID 991.)  Red Roof pointed out that Tudela admitted in his testimony that he did not conduct a full assessment before drafting his report.  (Doc. No. 59 at PageID 820; *see also* Doc. No. 59-9 (Tudela Dep. Excerpts) at PageID 935.)  Tudela testified that he "didn't truly flesh out … what would be needed with each" of the online travel agency extranets, including that he did not "write test scripts and really try to see how I could make things work."  (Doc. No. 59-9 at PageID 936.)  Tudela also testified that he was not asked to provide an expert opinion on whether the PCC position could be made accessible to a JAWS user

---

[1] Wright testified that there are "regular changes" to some of Red Roof's own systems and "third party systems," and that "Expedia [and] Booking.com, those extranets in particular change very frequently, weekly, sometimes, maybe even more often on occasion."  (Doc. No. 58-3 at PageID 777.)

and that he was not prepared to offer an expert opinion on that question. (*Id.* at PageID 937-38.) Furthermore, it was <u>not</u> Tudela's conclusion that the PCC position cannot be made accessible to a JAWS user. (*Id.*)

Additionally, Buchness explained in his report that the applications required for use in the PCC position are "partner extranet Web applications requiring secure login, meaning there is a private partnership between Red Roof Inns and each of" those third parties. (Doc. No. 59-8 at PageID 912.) Thus, in his opinion, the parties could work together and Red Roof could likely be provided information related to updates prior to implementation of those updates. (*Id.*) He also opined that "[n]ot only may the application **not** need to be 'rescripted' on every change, but the application may improve completely, and could even require the scripted solutions to be rolled back/off the PC." (*Id.* at PageID 913 (emphasis in original).) He also said that proactive actions can be taken to react to, or avoid, downtime. (*Id.* at PageID 917.) Although he admitted that he had not performed enough of an assessment to say what other access solutions might be needed for Derby (or any visually-impaired person) to use JAWS to perform as a PCC, Buchness testified that he had not seen any reason to believe that the PCC position could not be made accessible. (Doc. No. 59-14 (Buchness Dep. Excerpts) at PageID 970.)

### E. <u>Administrative Procedures, Complaint, and Current Motions</u>

On June 21, 2018, Derby filed a charge of discrimination with the EEOC. (Doc. No. 8 at PageID 33.) The EEOC subsequently issued to Red Roof a Letter of Determination after it found reasonable cause to believe that Red Roof had violated the ADA, and the EEOC invited Red Roof to engage in informal methods of conciliation. (*Id.*) Red Roof rejected the EEOC's conciliation offer. (*Id.* at PageID 34.) The EEOC then filed this lawsuit. (Doc. No. 1.)

In its Complaint, the EEOC alleges that Red Roof violated sections 102(a), 102(b)(1), 102(b)(2), and 102(b)(5)(A) and (B) of Title I of the ADA, 42 U.S.C. § 12112. (Doc. No. 1 at

PageID 3.)  The EEOC asserts that Red Roof was aware of Derby's disability and failed to (1) accommodate him to allow for his participation in the information seminar; (2) allow for his participation in the application process for the promotion; and (3) engage in the interactive process. (*Id.* at PageID 5.)  Additionally, the EEOC contends that Red Roof "denied Derby the promotion because of his disability and need for accommodation." (*Id.* at PageID 6.)  The EEOC clarified in its briefing that it asserts two claims: a failure to accommodate claim and a failure to promote claim.  (Doc. No. 59 at PageID 821-22.)

Red Roof filed a motion for summary judgment (Doc. No. 54) and, after being granted leave to file an amended motion, filed Red Roof's MSJ, which superseded its original motion. (Doc. No. 58.)  The EEOC filed a response in opposition to Red Roof's MSJ, and Red Roof filed a reply in support of its motion.  (Doc. No. 59; Doc. No. 65.)  The EEOC filed its motion for partial summary judgment, to which Red Roof filed a response in opposition and the EEOC then filed a reply in support.  (Doc. No. 57; Doc. No. 66; Doc. No. 69.)  Both Red Roof's MSJ and the EEOC's MSJ are fully briefed and ripe for review.

## II.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party, who "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at

255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 252.  "There must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.  The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict.  *Id*.

## III.  ANALYSIS

As shown in the analysis below, the Court will first address Red Roof's MSJ and then the EEOC's MSJ.

### A.  Framework for Considering the Alleged ADA Violations

#### (1)  The ADA's prohibition against discrimination

The Supreme Court has explained that the ADA "prohibits an employer from discriminating against an 'individual with a disability' who, with 'reasonable accommodation,' can perform the essential functions of the job."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 393 (2002) (quoting 42 U.S.C. § 12112(a) and (b)).  Specifically, the ADA provides that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  As used in that provision, the term "covered entity" includes an employer and the phrase "discriminate against a qualified individual on the basis of disability" includes, but is not limited to:

> [L]imiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; [or] …
>
> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation

> would impose an undue hardship on the operation of the business of such covered entity; or
>
> denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(1), (5).  Additionally, the term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).[2]

### (2) <u>Reasonable accommodation for the employee with a disability</u>

The ADA's regulations provide three alternatives for what can amount to a "reasonable accommodation":

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.R.F. § 1630.2(o)(1).  ADA regulations also discuss how it may be necessary for an employer to initiate an "informal, interactive process" to determine the appropriate reasonable accommodation:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable

---

[2] Furthermore, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).

accommodations that could overcome those limitations.

29 C.R.F. § 1630.2(o)(3).  The Sixth Circuit has explained that, "[e]ven though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith."  *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007).  "When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Id.* (internal quotation marks omitted).

### (3) <u>Undue hardship for the employer</u>

Under the ADA, "discrimination includes an employer's ***not making reasonable accommodations*** to the known physical or mental limitations of an otherwise qualified … employee ***unless*** the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  *US Airways*, 535 U.S. at 396 (internal quotation marks omitted; emphasis in original); *see also* 29 C.F.R. § 1630.2(o)(3).  The ADA specifies that "undue hardship" means "an action requiring significant difficulty or expense, when considered in light of the[se] factors":  "(i) the nature and cost of the accommodation needed"; "(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility"; "(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities"; and "(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity."  42 U.S.C. § 12111(10).

### (4) Framework for claims premised on direct evidence

The Sixth Circuit Court of Appeals has explained that "claims premised upon an employer's failure to offer a reasonable accommodation <u>necessarily</u> involve direct evidence (the failure to accommodate) of discrimination." *Kleiber*, 485 F.3d at 868 (emphasis added).  However, this "is not necessarily true of claims premised upon an adverse employment decision such as a failure to hire, failure to promote, or discharge." *Id.* at 868 n.2.  Regarding what constitutes direct evidence of discrimination, the Sixth Circuit has said that "[d]irect evidence of disability discrimination does not require the fact finder to draw any inference to conclude that the disability was at least a motivating factor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020); *see also Wiggins v. City of Montgomery, Ala.*, No. 2:17-cv-425-KFP, 2022 U.S. Dist. LEXIS 37492, 2022 WL 625075, at *4, 15-16 (M.D. Ala. Mar. 3, 2022) (explaining that the "quintessential example of direct evidence would be a memorandum from company management directing the termination of an employee because he is disabled"; following a bench trial, finding that the plaintiff presented direct evidence that she was not promoted because of her disability where the person in charge of hiring admitted that she would have promoted plaintiff but for plaintiff's disability and hired others because they were better able to do the job physically than plaintiff).

Here, when Derby informed Eichelberger that he was blind and expressed interest in the PCC job, Eichelberger responded:  "Unfortunately, the systems that we work with do not integrate with the JAWS system, so we are not able to accommodate as far as hiring.  … I just don't want you to waste your time if you were looking to apply."  (Doc. No. 58-4 at PageID 793-96.)  The EEOC argues that both of its claims—failure to accommodate and failure to promote—are direct evidence claims.  (Doc. No. 59 at PageID 821-22.)  Red Roof does not argue otherwise, but instead asserts that "even in cases involving direct evidence [of] discrimination, a plaintiff still has the

burden of proposing an accommodation and showing that the accommodation is objectively reasonable" (and that the EEOC has failed to satisfy this burden). (Doc. No. 65 at PageID 1028.)

The Court proceeds with the understanding that both of the EEOC's claims are direct evidence claims. The following framework is used for analyzing an ADA claim premised upon direct evidence:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber*, 485 F.3d at 869 (internal quotation marks omitted); *see also Fisher*, 951 F.3d at 417 (6th Cir. 2020). There is no dispute that Derby is disabled.[3] Additionally, Red Roof does not dispute that the PCC position would have been a promotion for Derby, Derby was not promoted to the open PCC position, and Red Roof filled the PCC position with a "sighted" employee. (*See* Doc. No. 59 at PageID 818-19; Doc. No. 65 at PageID 1034-35.)

### B. Red Roof's MSJ

In Red Roof's MSJ, Red Roof makes four arguments for why it is entitled to summary judgment: (1) Derby "failed to request an accommodation from" Red Roof; (2) the EEOC "has not articulated that a reasonable accommodation exists and is 'objectively reasonable'"; (3) the EEOC "has failed to establish that a 'reasonable' accommodation is possible"; and (4) the EEOC "has not shown Mr. Derby was 'otherwise qualified' for the position, as required to establish a prima facie

---

[3] "Legal blindness can qualify as a disability under the ADA." *Lankford v. RadioShack Corp.*, No. 3:04CV-294-H, 2006 U.S. Dist. LEXIS 30396, 2006 WL 1382265, at *2 (W.D. Ky. May 15, 2006); *see also* 29 C.F.R. § 1630.2(g)(1)(i) (ADA regulations defining disability to include "[a] physical or mental impairment that substantially limits one or more of the major life activities of" an individual); 29 C.F.R. § 1630.2(i)(1)(i) (ADA regulations stating that "seeing" is a major life activity).

case and to survive summary judgment."  (Doc. No. 58 at PageID 732; *see also* Doc. No. 65 at PageID 1026.)  Red Roof also argues that summary judgment is warranted on an alleged claim by the EEOC for failure to engage in the interactive process, the EEOC's failure to promote claim, and the EEOC's request for punitive damages.  (Doc. No. 58 at PageID 746-48.)  The Court addresses these arguments below.

### (1) Derby's failure to request an accommodation

Red Roof's first argument is that Derby was "required to request an accommodation" given that doing so is "part of a prima facie case of failure to accommodate under the ADA."  (Doc. No. 58 at PageID 734.)  The Court finds that Red Roof is not entitled to summary judgment based on this argument.  Fed. R. Civ. P. 56(c).

As an initial matter, the "prima facie case" to which Red Roof refers is for <u>indirect</u> evidence claims, not direct evidence claims.  *Fisher*, 951 F.3d at 416-17 (explaining that "ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination").  Red Roof argues that, "[t]o survive summary judgment, and to establish a prima facie case of failure to accommodate, an ADA plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) <u>he requested an accommodation</u>; and (5) the employer failed to provide the necessary accommodation."  (Doc. No. 58 at PageID 740-41 (emphasis added).)  However, those five requirements to establish a "prima facie case" of discrimination are part of the *McDonnell-Douglass* burden-shifting framework that is used "to determine whether a viable discrimination claim exists" when there is "no direct evidence of discrimination," <u>i.e.</u>, for indirect evidence claims.  *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 655 (6th Cir. 2016). The Supreme Court has explained that, "if a plaintiff is able to produce direct evidence of

19

discrimination, he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). As shown above, the EEOC's claims in this case are direct evidence claims. Therefore, the *prima facie* case requirements that Red Roof relies on for its argument are inapplicable here. *Kleiber*, 485 F.3d at 869 ("[w]hen an ADA plaintiff premises his claim upon direct evidence, we jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence cases (also called 'circumstantial-evidence cases')").

Despite this, the Court recognizes that, "[g]enerally, an ADA plaintiff bears the initial burden of proposing an accommodation." *Kleiber*, 485 F.3d at 870 (emphasis added). This makes sense. "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998). As the Sixth Circuit pointed out in *Gantt*, "[t]he applicable EEOC regulations provide that it is 'unlawful for a covered entity not to make reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.'" *Id.* at 1046 (quoting 29 C.F.R. § 1630.9(a); emphasis added in *Gantt*). Plus, "[t]he Commission's interpretive guidelines indicate that generally 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Id.* (quoting 29 C.F.R. pt. 1630 App. § 1630.9).

However, in certain instances, a request for accommodation can be inferred from the context of the situation. *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004) (finding that "a factfinder could infer that [plaintiff's] letter constituted a request for an accommodation" based on the context in which the letter was written). Furthermore, "[t]he employee is not required to use

magic words such as 'accommodation' and 'disability.'" *Fisher*, 951 F.3d at 419; *see also Smith*, 376 F.3d at 535.   "What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and the desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

One case in which a court found that a jury could infer a request for accommodation from the context of the employee and employer's interaction is *Applewhite v. FCA US LLC*, No. CV 17-11132, 2019 U.S. Dist. LEXIS 217242, 2019 WL 6894229 (E.D. Mich. Dec. 18, 2019).   The district court in *Applewhite* explained:

> The Court's analysis as to Plaintiff's reasonable accommodation claim begins with whether Plaintiff in fact requested an accommodation.   Defendant argues that Plaintiff did not make an accommodation request.   However, Defendant concedes in its brief that Plaintiff claimed to be able to work some tasks with his right arm only. In fact, Plaintiff made this claim during the same meeting in which Defendant told Plaintiff no work was available within his medical restriction. … Here, a reasonable jury could infer that Plaintiff's claim that he was able to do some of the tasks with his right arm only—made during the meeting in which Defendant stated no work was available within his restriction—constituted a request for reasonable accommodation that triggered Defendant's obligation to participate in an 'interactive process' with Plaintiff as to potential reasonable accommodations (i.e., determining which of the tasks could be done with only one arm).   Defendant's conclusion at that time that all tasks require two arms did not make Plaintiff's accommodation request something other than what it was.

*Applewhite*, 2019 WL 6894229, at *5 (internal citations omitted).   The district court concluded that summary judgment on the plaintiff's reasonable accommodation claim was inappropriate because a genuine issue of material fact remained.   *Id.*

Here, Red Roof is not entitled to summary judgment due to Derby's failure to specifically request an accommodation.   Although Eichelberger testified that she does not recognize her email exchange with Derby as a request for an accommodation (Doc. No. 58-4 at PageID 790), the email

exchange itself could support a finding that a request for accommodation is inferred from the context.  *Applewhite*, 2019 WL 6894229, at *5; *see also Smith*, 376 F.3d at 535-36 (reversing grant of summary judgment to employer; finding a genuine issue of material fact as to whether plaintiff's communication to her employer was a request for a reasonable accommodation).  In response to Eichelberger's email announcing the recent posting for the open PCC position and the information seminar, Derby indicated that he was interested in attending the information seminar, is blind, and was interested in possibly applying for the position.  (Doc. No. 58-4 at PageID 793-96.)  In her response to Derby, Eichelberger said:  "Unfortunately, the systems that we work with do not integrate with the JAWS system, so we are not able to accommodate as far as hiring."  (*Id.*)  Based on the email exchange, a reasonable jury could find that Red Roof knew of Derby's disability and desire for an accommodation.  *Taylor*, 184 F.3d at 313.  In fact, one could find that Eichelberger understood Derby's initial email to her as a request for an accommodation due to his blindness and that she then preemptively proposed an accommodation for Derby (JAWS) and shot it down—all in one sentence.  The Court believes "[a] reasonable factfinder could conclude that these interactions [between Derby and Eichelberger] constituted a request for accommodation."  *Fisher*, 951 F.3d at 420; *see also Smith*, 376 F.3d at 535-36.

Thus, Red Roof is not entitled to summary judgment based on its argument that the EEOC "has failed to establish that Mr. Derby requested an accommodation."  (Doc. No. 58 at PageID 741.)  Red Roof's cited caselaw does not convince the Court otherwise.[4]  For example, in *Aldini*

---

[4] Counsel is instructed to avoid misconstruing caselaw.  For example, Red Roof's MSJ states: "The ADA's reasonable accommodation requirement does not apply unless 'triggered by a request' from the employee.  *Alsept v. Honda of Am. Mfg.*, 2013 U.S. Dist. LEXIS 77530 (S.D. Ohio June 3, 2013)."  (Doc. No. 58 at PageID 742 (emphasis added).)  However, the full quote from *Alsept* clearly demonstrates that the requirement is not as absolute as Red Roof's counsel's statement to the Court portrayed:  "Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement **usually** does not apply unless 'triggered by a request' from the employee."  *Alsept*, 2013 U.S. Dist. LEXIS 77530, at *24 (emphasis added).

(one case relied on by Red Roof), the Sixth Circuit recognized that, "[i]n certain situations, a request for accommodation can be inferred by context." *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350-51 (6th Cir. 2015) (citing *Smith*, 376 F.3d at 535). The court in *Aldini* then went on to say that "a request for a reasonable accommodation—whether explicitly or by inference" is required to establish a *prima facie* claim for failure to accommodate. *Id.* However, the court's recitation of the requirements to establish a *prima facie* claim for failure to accommodate is for underline(indirect) evidence claims. *Id.* at 350. As shown above, the Sixth Circuit in *Fisher* clarified that "'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.'" *Fisher*, 951 F.3d at 417 (quoting *Kleiber*, 485 F.3d at 868). In fact, the Sixth Circuit in *Fisher* used *Aldini* as an example of a failure to recognize this distinction:

> [W]e have occasionally—though generally in unpublished cases—analyzed a failure-to-accommodate claim under the indirect test. *See, e.g.*, *Keogh v. Concentra Health Servs.*, 752 F. App'x 316, 326 (6th Cir. 2018); *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018); *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015); *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). These cases do not explain why they apply the indirect test rather than the direct, nor do they distinguish *Kleiber* and its progeny. And each can be traced back to a single case, *DiCarlo v. Potter*, that applied the indirect test when analyzing a failure to accommodate claim under the Rehabilitation Act, not the ADA. 358 F.3d 408, 419 (6th Cir. 2004). Our court, sitting en banc, has explained that though the two statutes have many similarities, they are not identical. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17 (6th Cir. 2012) (en banc). *Kleiber*, our foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls.

*Fisher*, 951 F.3d at 416-17. Thus, *Aldini* applied the indirect evidence requirements, rather than the direct evidence requirements applicable in this case.

Perhaps more importantly,[5] the *Aldini* case is also factually distinguishable. In that case,

---

[5] The direct evidence test still requires the plaintiff to establish "that he or she is otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) underline(with a proposed) reasonable accommodation." *Kleiber*, 485 F.3d at 869 (emphasis

although the plaintiff requested an accommodation by presenting a doctor's note setting out certain restrictions, he had retracted his request less than 24 hours later (by presenting a new doctor's note clearing him to return to work without restrictions), and, "[f]rom that point on, [the plaintiff] worked with no restrictions *for two years* and, according to his own testimony, ***never again requested an accommodation*.**  *Aldini*, 628 F. App'x at 351 (emphasis in original).  The Sixth Circuit in *Aldini* explained that, although the plaintiff "relies heavily on *Smith* to argue we should infer he requested an accommodation, this case is easily distinguishable because we have no evidence to establish that anyone at Kroger was aware Aldini had a disability or needed an accommodation after" plaintiff presented the new doctor's note two years earlier.  *Id.*

### (2) Whether Derby was otherwise qualified for the PCC position with a reasonable accommodation

Red Roof next argues that the EEOC "cannot establish that Mr. Derby was 'otherwise qualified' for the position within the meaning of the ADA because the unpredictability of independent, third-party websites and the inherent limitations of JAWS' software render Mr. Derby unable to perform the essential functions of the job, with or without a reasonable accommodation."  (Doc. No. 58 at PageID 745.)  Red Roof also argues that it is entitled to summary judgment because the EEOC "has not shown an accommodation is possible and objectively reasonable" and the EEOC has failed to establish that Derby "was otherwise qualified for the PCC position."  (Doc. No. 58 at PageID 744-45.)  In response, the EEOC argues that JAWS was such an accommodation, it was known that Derby already relied on JAWS to access the programs used in his previous positions, and—from a financial perspective—providing JAWS as an accommodation would have been facially plausible, given Red Roof's revenue and history of taking measures to implement JAWS for other positions.  (Doc. No. 59 at PageID 826-27.)

---

added; internal quotation marks removed).

Additionally, the EEOC contends that Red Roof's "arguments about the alleged unpredictability of third-party websites are a smokescreen, designed to obscure the fact that Red Roof did not assess whether the [PCC] position could be made JAWS accessible before rejecting Derby." (*Id.*)

As set forth above, in analyzing an ADA claim premised upon direct evidence, the "plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: … with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869. Given that there is no dispute that Derby is disabled, "to survive summary judgment, it is [the EEOC's] burden to submit evidence sufficient to create a genuine issue of material fact regarding whether [Derby] is qualified for [the PCC] position with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869. An employee is "qualified" only if he or she can perform the essential functions of the employment position with or without a reasonable accommodation. 42 U.S.C. § 12111(8) (defining "qualified individual" for purposes of the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). The Sixth Circuit in *Fisher* provided an example illustrating the issue of an employee being "not qualified":

> Imagine … a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods. In other words, even though presence in the classroom when the bell rings is an attendance requirement, a tardy teacher is not unqualified if his tardiness results from his employer's unwillingness to accommodate. If, by contrast, no reasonable accommodation would cure the attendance problem—as, for example, when an employee is not medically cleared to work at all or blames his absences on car problems rather than disability—the employee is not qualified.

*Fisher*, 951 F.3d at 418; *see also* 42 U.S.C. § 12112(a) (prohibiting discrimination against a "qualified individual" on the basis of disability in regard to—among other things—job application procedures, hiring, and advancement of employees).

Here, Derby testified that he possesses each of the qualifications listed in the PCC job

description.  (Doc. No. 59-6 at PageID 881, 897.)  Red Roof's position is that an essential function of a PCC "is to access, interact with, and utilize multiple third party websites outside of the [Red Roof] internal system and, therefore, outside of [Red Roof's] control."  (Doc. No. 65 at PageID 1029.)  Yet, Derby "is not unqualified" for the PCC position if his inability to perform its essential functions "results from his employer's unwillingness to accommodate."  *Fisher*, 951 F.3d at 418.  The EEOC's position is that Derby could, with JAWS (the alleged reasonable accommodation), perform the essential functions of the PCC position.  (Doc. No. 59 at PageID 826-27.)

To defeat a defendant-employer's motion for summary judgment, a plaintiff-employee "need only show that an accommodation seems reasonable on its face, *i.e.*, ordinarily or in the run of cases."  *US Airways*, 535 U.S. at 401 (internal quotation marks omitted).  "The defendant then must show either 'special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances' or that the proposed accommodation eliminates an essential job requirement."  *Fisher*, 951 F.3d at 419 (quoting *US Airways*, 535 U.S. at 402).  Notably, "[t]he reasonableness of a proposed accommodation is a question of fact."  *Id.*

The Court finds that the EEOC has shown that an accommodation (specifically, using JAWS) "seems reasonable on its face."  *US Airways*, 535 U.S. at 401.  The PCC position involves using a computer to review information and electronically input information using a computer (and possibly field inquiries by telephone).  (*See* Doc. No. 57-9.)  JAWS is a computer screen reading program for Microsoft Windows that allows blind and visually-impaired individuals to read the information on a computer screen either with a text-to-speech output or a refreshable Braille display.  (Doc. No. 58-2 at PageID 770; Doc. No. 59-8 at PageID 907.)  Derby is a very experienced, sophisticated JAWS user.  (Doc. No. 59-6 at PageID 884-85; Doc. No. 59-9 at PageID 931.)  And, Red Roof has used Tudela to script computer programs for Derby's other jobs with

Red Roof so that those programs would be compatible with JAWS and Derby could perform the functions of those other jobs.  (Doc. No. 59-6 at PageID 893-94; Doc. No. 59-3 at PageID 868.)  Moreover, Buchness opined that, given the relationship between Red Roof and the online travel agencies who use the extranet applications, information related to updates on those applications could likely be provided to Red Roof prior to implementation.  (Doc. No. 59-8 at PageID 912.)  And, "[n]ot only may the application **not** need to be 'rescripted' on every change, but the application may improve completely, and could even require the scripted solutions to be rolled back/off the PC."  (*Id.* at PageID 913 (emphasis in original).)

Whether the EEOC establishes that JAWS actually was a "reasonable accommodation" will be a question for the jury.  Again, the "reasonableness" of an accommodation involves questions of fact for the jury to decide.  *Fisher*, 951 F.3d at 419.  The Court believes that evidence—including testimony from Buchness, Tudela, and Derby—could support a reasonable jury finding that the use of JAWS was a reasonable accommodation (and, vice versa, could support a finding that it was not a reasonable accommodation).  Again, it is not the judge's function at the summary judgment stage to make credibility determinations and weigh the evidence.  *Anderson*, 477 U.S. at 249, 255.

Additionally, the Court finds that Red Roof has not shown "either special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances or that the proposed accommodation eliminates an essential job requirement."  *Fisher*, 951 F.3d at 419 (internal quotation marks omitted).  Red Roof "has not set forth specific facts indisputably demonstrating that such an accommodation would have resulted in 'significant difficulty or expense.'"  *Smith*, 376 F.3d at 536-37 (emphasis added) (quoting 29 C.F.R. § 1630.2(p)) (employer not entitled to summary judgment); *see also Svoboda v. TimkenSteel Corp.*, No. 5:18-cv-1443,

2020 U.S. Dist. LEXIS 54542, 2020 WL 1513710, at *9-10 (N.D. Ohio Mar. 30, 2020) (accommodation that plaintiff wear a full-hood breathing device while performing his duties was reasonable on its face and defendants were not entitled to summary judgment on the basis that the proposed accommodation was unreasonable where, although defendant-employer expressed concerns about safety and plaintiff's ability to perform his duties while wearing the device, defendant-employer did not attempt to simulate plaintiff's duties while wearing the device and had never actually reached the determination of whether the device could be safely used by plaintiff while performing his duties). For example, Tudela testified that he "didn't truly flesh out … what would be needed with each" of the online travel agency extranets, including that he did not "write test scripts and really try to see how I could make things work." (Doc. No. 59-9 at PageID 936.) In response, Buchness stated that Tudela "did not perform a thorough assessment of the applications before preparing his report to determine whether scripting for these specific applications would be necessary, or to what degree it might be necessary given Mr. Derby's skill level with" access technologies. (Doc. No. 59-8 at PageID 991.) Additionally, Eichelberger testified that she has no knowledge regarding JAWS' capabilities and limitations, yet she told Derby that "the systems that we work with do not integrate with the JAWS system" without ever speaking to anyone. (Doc. No. 59-2 at PageID 842, 848.) And, Wright acknowledged that she had not talked to anyone about whether JAWS could be used with the extranet sites that the PCCs used and does not believe that she had ever talked to anyone about whether a JAWS user could hold a PCC position. (Doc. No. 59-3 at PageID 871.)

As set forth in more detail below, whether Red Roof actually establishes that implementing JAWS for use by a PCC would impose an undue hardship on Red Roof's business operation will be a question for the jury. (In fact, in its response to the EEOC's MSJ, Red Roof acknowledges

that genuine issues of material fact exist regarding whether that alleged reasonable accommodation would impose an undue hardship on the operation of its business. (Doc. No. 66 at PageID 1112, 1117.)) Evidence, including testimony from the two purported expert witnesses in this case, could support a reasonable jury finding that implementing JAWS would not impose an undue hardship on Red Roof (or vice versa). Once again, the Court will not make credibility determinations regarding the competing testimony on these issues—which a reasonable jury could decide either way.

Assuming as true the EEOC's evidence (i.e., the evidence of the nonmoving party) and drawing all reasonable inferences in its favor (*Anderson*, 447 U.S. at 255), the Court finds that genuine issues of material fact exist regarding whether implementing JAWS was a reasonable accommodation and whether Derby was qualified for the PCC position with that alleged reasonable accommodation. *See Fisher*, 951 F.3d at 421 (concluding that the defendant was not entitled to summary judgment on failure to accommodate claim because a factfinder could conclude that the plaintiff was qualified for a vacant position); *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1231-32 (6th Cir. 2022) (reversing district court's grant of summary judgment on disability discrimination claim where a reasonable jury could find that the proposed accommodation was reasonable based on certain evidence).

### (3) Accommodation to participate in information seminar

The EEOC's failure to accommodate claim also encompasses the alleged failure to allow Derby to participate in the information seminar. (*See* Doc. No. 1 at PageID 5.) The argument in Red Roof's MSJ concerning the information seminar is relatively limited. It is undisputed that Derby requested attending the information seminar "via Skype or some other remote option" and that attending "via Skype or some other remote option" would be a reasonable accommodation. Red Roof argues that it is entitled to summary judgment on this aspect of the claim because Derby

"was not denied the opportunity to attend an informational seminar, but rather, was asked to wait until Ms. Eichelberger was able to determine how to present the seminar remotely in the near future." (Doc. No. 58 at PageID 743.) Red Roof asserts that "[a] disabled person is not entitled to an accommodation of his choice but rather a reasonable accommodation given the circumstances" and that "[r]equesting Mr. Derby wait until a date in the near future to attend the seminar is objectively reasonable." (*Id.* (citing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)) (internal quotation marks omitted).)

The Court takes no issue with Red Roof's assertion that a disabled person is not entitled to an accommodation of his choice. The Court also acknowledges that, "although an employee is not required to accept an offered accommodation, if an individual rejects a reasonable accommodation, the individual will no longer be considered a qualified individual with a disability." *Hedrick*, 355 F.3d at 457 (finding that the plaintiff employee rejected a reasonable accommodation). However, *Hedrick* also held that "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hedrick*, 355 F.3d at 457; *see also* 42 U.S.C. § 12112(b)(5)(A) (defining "discriminate against a qualified individual on the basis of disability" under the ADA to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity") (emphasis added); *Black v. Wayne Ctr.*, No. 99-1225, 2000 U.S. App. LEXIS 17567, at *11 (6th Cir. July 17, 2000) (cited in Red Roof's MSJ; "the law in this circuit does not entitle [plaintiff-employee] to the accommodation of her choice, but only a reasonable accommodation" and the defendant-employer "provided" the plaintiff-employee with reasonable accommodations).

Here, Derby did not reject the presumably reasonable accommodation of attending a later seminar (Doc. No. 58-4 at PageID 793-96), yet there is no evidence that Red Roof actually "provided" that presumably reasonable accommodation, despite having offered it.  *Hedrick*, 355 F.3d at 457.  In fact, Eichelberger told Derby that "[w]e will be holding more seminars in the near future," yet admitted at her deposition that she did not have any additional seminars scheduled and never scheduled another seminar.  (Doc. No. 58-4 at PageID 793-96; Doc. No. 59-2 at PageID 852.)  Therefore, the Court does not agree with Red Roof that it is entitled to summary judgment on this aspect of the EEOC's failure to accommodate claim.

### (4) Alleged claim for failure to engage in the interactive process

Red Roof also argues that summary judgment is warranted on the EEOC's alleged failure to engage in the interactive process "[c]laim."  (Doc. No. 58 at PageID 746-47.)  Red Roof argues that, because Derby "never requested an accommodation related specifically to the PCC position," its "duty to engage in the interactive process was never triggered."  (Doc. No. 58 at PageID 747.)  However, as shown above, the Court has found that the email exchange interaction between Eichelberger and Derby could support a finding that a request for accommodation is inferred from the context.  Therefore, the Court disagrees with Red Roof's argument regarding why it would be entitled to summary judgment.[6]

However, because this case will continue after the Court issues this order, the Court finds it necessary to clarify that the EEOC cannot pursue an independent claim in this case for failure to engage in the interactive process (even assuming that Red Roof had a duty to engage in the

---

[6] Red Roof's cited cases do not convince the Court otherwise.  *See, e.g., Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 787-88 (6th Cir. 2002) (case distinguishable where the court found that plaintiff's "failure to cooperate with the procedures delineated in the collective bargaining agreement effectively precluded the defendants from further assisting her in her search for an appropriate position at the Plant" and GM had provided plaintiff with a reasonable accommodation such that GM would not be liable for a breakdown in the interactive process).

interactive process).  First, there is no indication that the EEOC is pursuing such a claim.  While the EEOC does allege that Red Roof failed to engage in the interactive process, the Complaint does not specify a claim for failure to engage in the interactive process (*see* Doc. No. 1), and, as mentioned above, the EEOC clarified in its briefing that it asserts only two claims in this case: a failure to accommodate claim and a failure to promote claim (Doc. No. 59 at PageID 821-22).  Second, even if the EEOC was pursuing such a claim, the claim would fail.  The ADA regulation that references the "interactive process" states the following:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).  Thus, the purpose of the "interactive process" is "[t]o determine the appropriate reasonable accommodation." *Id.*  In line with that purpose, the Sixth Circuit has held that, even if an employer "did not put sufficient effort into the interactive process of finding an accommodation, that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (emphasis removed) (internal citation and quotation marks removed).

Here, as referenced above in the Court's analysis of the failure to accommodate claim, the EEOC's position is that JAWS is the reasonable accommodation that would have allowed Derby to perform the essential functions of the PCC position.  (Doc. No. 59 at PageID 826 (EEOC arguing that, "[h]ere, JAWS was the existent plausible accommodation Derby required") (emphasis removed).)  Yet, JAWS is exactly what Eichelberger identified in her email chain with Derby.  (Doc. No. 58-4 at PageID 793-96.)  Additionally, the EEOC has not argued that there was any other possible accommodation besides JAWS or that Derby was prevented from identifying an appropriate accommodation due to Red Roof's alleged failure to engage in the interactive process.

*See Kottke v. PetSmart, Inc.*, No. 16 C 8849, 2018 U.S. Dist. LEXIS 112433, 2018 WL 3329698, at *3 (N.D. Ill. July 6, 2018) (despite employer's failure to complete the interactive process, the alleged reasonable accommodation had been identified and the employee had "not pointed to any other accommodation that she would have proposed if the interactive process had continued" and she had not suggested any other accommodation—even during the subsequent litigation). Red Roof identified the alleged appropriate reasonable accommodation.[7] Therefore, any alleged failure by Red Roof to engage in the interactive process is not actionable because—even under the EEOC's theory of the case that Derby was a qualified individual—that failure did not "prevent[] identification of an appropriate accommodation for a qualified individual." *Ford Motor*, 782 F.3d at 766; *see also* 29 C.F.R. § 1630.2(o)(3) (the purpose for engaging in the interactive process is to determine the appropriate reasonable accommodation); *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 840 (6th Cir. 2018) (where defendant university had identified the accommodation that would have allowed plaintiff pharmacy student (who suffered from paranoid delusions) to continue in the pharmacy program, and plaintiff rejected that proposed accommodation, plaintiff's claim that defendant failed to engage in an interactive process was unavailing).

**(5) <u>Claim for failure to promote</u>**

The EEOC claims that Red Roof denied Derby a promotion to the PCC position because of his disability and need for accommodation. (Doc. No. 1 at PageID 6.) Red Roof argues that the EEOC "cannot make a prima facie case for failure to promote because it cannot show that Mr. Derby applied for the PCC position in question." (Doc. No. 58 at PageID 747; *see also* Doc. No.

---

[7] The same is true with respect to the alleged failure to allow Derby to participate in the information seminar. There is no dispute that attending the information seminar "via Skype or some other remote option" was identified by Derby and Red Roof as an appropriate accommodation, and the EEOC has not argued that there was any other possible accommodation or that Derby was prevented from identifying an appropriate accommodation due to Red Roof's alleged failure to engage in the interactive process.

65 at PageID 1034-35.)  Therefore, according to Red Roof, it is entitled to summary judgment on the failure to promote claim.  (Doc. No. 58 at PageID 747.)

The Court disagrees.  Red Roof, citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000), asserts that, "[i]n order to establish a prima facie case of failure to promote, a plaintiff must demonstrate that: 1) he is a member of a protected class; 2) he applied for and was qualified for a promotion; 3) he was considered for and denied the promotion; and 4) other employees of similar qualifications who were not members of the protected class received promotions at the time her request for a promotion was denied."  (Doc. No. 58 at PageID 747.) Thus, demonstrating that the employee applied for a promotion is part of the second requirement under this method for establishing a *prima facie* case.  However, as set forth above, the Court understands both of the EEOC's claims to be direct evidence claims.  (Doc. No. 59 at PageID 821-22; Doc. No. 65 at PageID 1028.)  And, Red Roof ignores that the Sixth Circuit in *Nguyen* said that another way to establish a *prima facie* case of failure to promote is through direct evidence.[8] *Nguyen*, 229 F.3d at 563.

### **(6) Punitive damages**

Finally, Red Roof argues that the EEOC is not entitled to punitive damages "because the undisputed facts fail to establish 'malice' or reckless indifference' as a matter of law."  (Doc. No. 58 at PageID 748.)  The EEOC responds by arguing that there is sufficient evidence to support an award of punitive damages.  (Doc. No. 59 at PageID 831-32.)

The ADA permits an award of punitive damages if the complaining party demonstrates

---

[8] Therefore, the Court need not and does not consider the parties' arguments concerning potential "exceptions" to the application "requirement" (for non-direct evidence claims), as well as any potential concerns that all of Red Roof's cases cited in support of its argument for summary judgment on the failure to promote claim are Title VII non-disability discrimination actions.  (*See* Doc. No. 58 at PageID 747; Doc. No. 59 at PageID 830-31; Doc. No. 65 at PageID 1034-35.)

that the employer engaged in a discriminatory practice "with malice or with reckless indifference" to an employee's federally protected rights. *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 582-83 (6th Cir. 2014); *see also* 42 U.S.C. §§ 1981a(a)(2) & (b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).

"The appropriateness of a punitive damage award is to be assessed under the three-part inquiry set forth in *Kolstad*." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1072 (6th Cir. 2015). First, to be potentially liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad*, 527 U.S. at 536. "Employers who are simply unaware of the relevant federal prohibition or believe that the discrimination is lawful are not subject to punitive damages liability." *Bates*, 767 F.3d at 583 (internal quotation marks omitted). Second, if the plaintiff has made the requisite showing of malice or reckless indifference on the part of certain individuals, then "[t]he plaintiff must impute liability for punitive damages to" the employer. *Kolstad*, 527 U.S. at 539. Agency law applies to determine whether liability can be imputed to the employer. *Parker v. Gen. Extrusions, Inc.*, 491 F.3d 596, 602 (6th Cir. 2007); *Kolstad*, 527 U.S. at 539-43. The employer "may be liable for punitive damages if it authorizes or ratifies the agent's tortious act, or if it acts recklessly in employing the malfeasing agent" or "where an employee serving in a managerial capacity committed the wrong while acting in the scope of employment." *Kolstad*, 527 U.S. at 543 (internal quotation marks omitted). "Third, the defendant may avoid punitive-damages liability by showing that it engaged in good-faith efforts to comply with" the antidiscrimination statute. *New Breed Logistics*, 783 F.3d at 1072; *see also Kolstad*, 527 U.S. at 545 ("in the punitive damages context,

an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII") (internal quotation marks omitted); *Denoewer v. Union Cnty. Indus.*, No. 2:17-cv-660, 2020 U.S. Dist. LEXIS 44966, 2020 WL 1244194, at *12 (S.D. Ohio Mar.16, 2020) ("[a] defendant can avoid punitive damages by showing that it engaged in good faith efforts to comply with the law").

Red Roof asserts that the EEOC's "entire case is based exclusively on an email exchange between" Derby and Eichelberger and that "[t]he tone of Ms. Eichelberger's email is not malicious; indeed, she used a 'smile' emoji." (*Id.*)  The EEOC responds by pointing to evidence that Red Roof offered company-wide training on topics that included the ADA and reasonable accommodations (which supervisors and managers from the Contact Center were required to attend); Eichelberger was a supervisor; Wright was aware that Red Roof had a process related to reasonable accommodations for individuals with disabilities, and her understanding was that if such a request was made, it needed to be brought to the attention of HR; Wright testified that she believes she had a conversation with Eichelberger about Derby's email and that they discussed whether they thought a blind person could work in the department and that it wouldn't be reasonable for someone who needed the JAWS system to fill the PCC position; and that Wright "took no further steps to, for example, contact Human Resources, or consult Tudela about potential JAWS accessibility." (Doc. No. 59 at PageID 832; Doc. No. 59-10 at PageID 942.)  Additionally, as shown above, evidence supports that neither Eichelberger nor Wright made any effort to determine JAWS' capabilities or consulted with anyone with such knowledge regarding whether a PCC's functions could be performed by a JAWS user, before Eichelberger informed Derby that "the systems that we work with do not integrate with the JAWS system, so we are not able to

accommodate as far as hiring." (Doc. No. 58-4; Doc. No. 59-2 at PageID 842, 851; Doc. No. 59-3 at PageID 871.) The evidence also supports that Eichelberger essentially lied to Derby when she told him that more information seminars—which he could attend through Skype—would be held in the near future. (Doc. No. 58-4 at PageID 793-96; Doc. No. 59-2 at PageID 852.)

Assuming the EEOC's evidence as true and drawing all reasonable inferences in its favor, the Court finds that genuine issues of material fact relevant to *Kolstad*'s three-part inquiry exist. For example, whether the alleged conversation between Eichelberger and Wright actually happened, when it happened (if it did happen), and what they discussed (if it did happen). Red Roof's MSJ does not address *Kolstad*'s three-part inquiry. Red Roof is not entitled to summary judgment on the EEOC's request for punitive damages. Fed. R. Civ. P. 56(c).

## C. **The EEOC's MSJ**

In the EEOC's MSJ, the EEOC asks the Court to enter summary judgment in its favor on Red Roof's "undue hardship" affirmative defense. (Doc. No. 57 at PageID 595.) The EEOC argues that Red Roof "lacks evidence that to accommodate Wesley Derby in the Property Connectivity Coordinator position would create a significant difficulty or expense when considering the factors set forth in 42 U.S.C. § 12111(10)(B)." (*Id.*) The EEOC "asks this court to rule that, as a matter of law, Red Roof's affirmative defense fails." (*Id.* at PageID 597.) Red Roof responds by arguing, among other things, that its undue hardship defense is "contingent on a number of factual considerations" and genuine issues of material fact exist. (Doc. No. 66 at PageID 1112.)

### (1) **Undue hardship principles**

As stated above, the ADA's prohibition on discriminating against a qualified individual on the basis of disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or

employee, <u>unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity</u>." 42 U.S.C. § 12112(b)(5) (emphasis added). The ADA specifies that "undue hardship" means "an action requiring significant difficulty or expense, when considered in light of the[se] factors": "(i) the nature and cost of the accommodation needed"; "(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility"; "(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities"; and "(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity." 42 U.S.C. § 12111(10). Thus, "undue hardship" can involve significant difficulty <u>or</u> significant expense. 42 U.S.C. § 12111(10). It need not involve both. *Id.*

### **(2) Application**

Red Roof's evidence of undue hardship focuses on trying to show significant difficulty in implementing the alleged reasonable accommodation. For example, Wright testified that there are "regular changes" to "third party systems," and that the extranets for Expedia.com and Booking.com "in particular change very frequently, weekly, sometimes, maybe even more often on occasion." (Doc. No. 58-3 at PageID 777.) She also testified that Red Roof "get[s] zero heads up from" the third-party online travel agencies about such changes. (Doc. No. 66-1 at PageID 1123.) According to Wright, Red Roof's belief was that the changes would require continuous scripting for JAWS. (*Id.* at PageID 1123-24.) She also testified that Tudela, who Red Roof uses for scripting purposes concerning JAWS, "was not always readily available" because he has other

38

responsibilities besides performing work for Red Roof. (*Id.* at PageID 1123.) She anticipated the changes and Tudela's availability would result in "a lot of downtime" during which a visually-impaired person would not be able to perform a PCC's functions. (*Id.*)

Similarly, Tudela explained that there are three overarching issues with attempting to accommodate a blind person to perform as a PCC by using JAWS: the online travel agency extranets are outside of Red Roof's control; changes are made to the online travel agency extranets frequently and without notice; and, until such changes can be addressed by a specialized JAWS scripter, such changes may result in a period of downtime during which the blind employee may be unable to perform the functions of a PCC. (*See* Doc. No. 58-2; Doc. No. 58 at PageID 739-40.) In his report, Tudela opined:

> The JAWS feature set and its configurability is complex. Many software programs require JAWS scripting to allow blind or visually impaired users to utilize them. JAWS scripters are not as common as general IT professionals as it is a specialized skill set. In situations involving difficult software or advanced job efficiency requirements, a JAWS scripter with an even more advanced skill set may be required. …
>
> … I am an independent contractor used on an as-needed basis by numerous companies and JAWS users throughout the United States. For the past 9 years, I've functioned as the primary JAWS script developer for Red Roof Inn's JAWS users in its call center. The first 2 years were funded by Ohio's Vocational Rehabilitation Agency and the remaining 7 years were funded directly by Red Roof Inn. Red Roof Inn is one of many companies I perform work for involving JAWS scripting. …
>
> … [T]he Property Connectivity Coordinator position requires the use of many third party websites, outside of the Red Roof Inn internal system and outside of Red Roof Inn's control. …
>
> The updates installed by third party websites may render the previous scripting of the JAWS program to be incompatible with the newly updated third party website and may render the website to be inaccessible for the JAWS user. It is impossible for the JAWS software to be scripted to ensure future compatibility with updates to the third party websites utilized in the Property Connectivity Coordinator position or any other third party website. When a third party website updates its software, the JAWS software may need to be re-scripted to allow the JAWS user to access the third party website's newly installed software. When a third party website updates its software, there may be a period of down-time from the time the update

is identified by a JAWS user who is unable to access the website, or a specific feature of the website, until it can be re-scripted by a specialized JAWS scripter. Rescripting requires configuring the JAWS software to be compatible with another piece of software.  Rescripting also necessitates contact to a specialized JAWS scripter and the amount of time to rescript a third party website to allow accessibility to a JAWS user is contingent upon urgency, complexity, and the availability of the specialized JAWS scripter.

(Doc. No. 58-2 at PageID 770.)  Tudela also stated that his "hourly rate for contractor scripting with Red Roof Inn is $125 per hour," but, in his opinion, "it is impossible to predict how much time would be required to rescript updates to any third party website because each update is unique and varies in terms of complexity."  (*Id.* at PageID 771.)

Tudela and Buchness disagree on the amount of difficulty in implementing and maintaining a PCC's use of JAWS.  (*See, e.g.,* Doc. No. 58-2 at PageID 770-71; Doc. No. 59-8 at PageID 912-13, 917.)  This includes disagreements on the level of control that Red Roof has over receiving advanced notice of changes made to the online travel agency extranets and the effect that such changes would have (including the extent of "downtime" while scripting is performed).  (*Id.*)

Assuming as true the evidence of Red Roof (the non-moving party for purposes of this section of the order) and drawing all reasonable inferences in Red Roof's favor, the Court finds that reasonable jurors could find in favor of Red Roof on the undue hardship issue and affirmative defense.  Additionally, there are genuine issues of material fact regarding whether implementing JAWS for use by a PCC would impose an undue hardship on Red Roof's operation.  42 U.S.C. § 12112(b)(5); *Holt v. Olmsted Twp. Bd. of Trs.*, 43 F. Supp. 2d 812, 823-25 (N.D. Ohio 1998) (finding genuine issue of fact concerning whether plaintiff's proposed reasonable accommodation imposed an undue hardship where there "still exists a question of fact concerning what effect a change to permanent shifts would have upon the Department"); *E.E.O.C. v. Rock-Tenn Co.*, No. 1:14-cv-973, 2016 WL 6127844, at *6 (W.D. Mich. Feb. 3, 2016) (finding that whether the difficulty in having other individuals temporarily perform plaintiff's duties "was sufficient to be

an undue hardship is a question for the jury," despite defendants not having "identified any expense that was incurred, let alone a significant expense"). Given the evidence, the Court will not rule that Red Roof's affirmative defense of undue hardship fails as a matter of law. Therefore, the EEOC's MSJ is denied.

IV.    <u>**CONCLUSION**</u>

For the reasons stated above, the Court **DENIES** Defendant Red Roof Inns, Inc.'s Amended Motion for Summary Judgment (Doc. No. 58) and **DENIES** Plaintiff EEOC's Motion for Partial Summary Judgment (Doc. No. 57). The Court clarifies that it finds the EEOC is not pursuing an independent claim for failure to engage in the interactive process and that, even if the EEOC was pursuing such a claim, any alleged failure by Red Roof to engage in the interactive process with Derby under the particular circumstances presented in this case is not itself actionable. This case shall continue in accordance with the Court's scheduling order.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, August 16, 2022.

s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE